911 So.2d 145 (2005)
Gerald A. CASTIGLIANO, Appellant,
v.
Daniel O'CONNOR, and his wife, Susette O'Connor, Appellees.
No. 3D04-3019.
District Court of Appeal of Florida, Third District.
June 22, 2005.
Rehearing and Rehearing Denied October 5, 2005.
*147 Woodrow Melvin, Jr., P.A., Miami, for appellant.
Lydecker & Wadsworth, LLC, Miami, and Carlos L. de Zayas, for appellees.
Before WELLS, SHEPHERD, and CORTIÑAS, JJ.
Rehearing and Rehearing En Banc Denied October 5, 2005.
CORTIÑAS, Judge.
The seller, Gerald A. Castigliano ("seller"), appeals from a final judgment and decree granting specific performance of a contract for the purchase of a condominium to the purchasers, Daniel O'Connor and Susette O'Connor ("purchasers"). We reverse.
On October 24, 2000, the parties entered into a "Contract for Sale and Purchase" of a condominium in Key Biscayne, Florida for $389,000 ("sales contract"). Thereafter, the title company conducted a lien search and informed the purchasers that there was a purchase money mortgage on the property in favor of Bank of America for $145,000. The seller and the purchasers were aware of this first mortgage. However, the title company also discovered the following three mortgage liens against the property, which neither party was aware of: 1) an Equicredit Corporation of America ("Equicredit") mortgage for $100,000; 2) a second Bank of America mortgage for $99,000; and 3) a Sterling Bank mortgage for $90,000 (collectively "fraudulently procured mortgages"). The parties do not dispute that each of the three fraudulently procured mortgages was placed against the property by the seller's investment advisor, without the seller's knowledge.
The title company informed the seller that he could not obtain title insurance until all mortgages were satisfied. Pursuant to the sales contract, the seller was obligated to make a "diligent effort" to cure title defects. Section VI C of the sales contract provided that the seller had 45 days after notice of title defects to cure such defects. Section VI D provided that:
In the event the Seller cannot cure the title defects, the Purchaser shall have the option of (a) accept [sic] title in "as is" condition; or (b) cancel [sic] the Contract, and the deposit shall forthwith be returned to Purchaser, and Purchaser and Seller shall be relieved, as to each other, of all obligations under this Contract.
Furthermore, Section XIX provided that:
If for any reason other than the failure of Seller to make Seller's title marketable after diligent effort, Seller fails, neglects or refuses to perform this Contract, Purchaser may seek specific performance or elect to receive the return of Purchaser's deposit. (emphasis added).
Due to the title defects, the scheduled closing did not occur. Instead, the parties agreed to enter into a month to month "Residential Lease-Purchase Agreement" that made reference to the sales contract ("lease agreement"). The lease agreement was executed to allow the seller an opportunity to clear the mortgages and permit the parties to close on the sales contract. The lease agreement provided that, after the first month, each monthly rent payment would be held in escrow and applied to the purchase price of the condominium. The lease agreement also provided that it could be cancelled by either party upon 30 days written notice.
*148 The seller made attempts to have his investment advisor pay the fraudulent mortgages, but the investment advisor refused and eventually fled the United States. Consequently, in June 2001, the seller attempted to terminate the lease agreement and, in July 2001, filed an action to evict the purchasers.
Because payments were not made on the fraudulently procured mortgages, the three banks holding those mortgages filed consolidated foreclosure actions. The seller eventually defeated the Equicredit mortgage by showing his signature had been forged. However, foreclosure actions continued with respect to the other two fraudulently procured mortgages. In order to prevent the foreclosure sale of the condominium, the purchasers bought those foreclosure judgments in favor of Sterling Bank and the second Bank of America mortgage. Sterling Bank and Bank of America then assigned all of their rights, title, and interest in their final judgments of foreclosure to the purchasers, who presently hold those two mortgages on the property.
After conducting a non-jury trial, the trial court found that the purchasers "have tendered the balance due and have been ready, willing and able to pay such balance, or been excused from such performance by the conduct of the Seller in refusing to close." The trial court concluded that the seller failed to use his best efforts to clear any title defects before terminating the sales contract, as modified by the lease agreement. The trial court also found that, by allowing the purchasers to remain in possession of the property after the 45-day termination deadline of the sales contract, the seller waived the deadline.
The trial court granted final judgment and a decree of specific performance finding that the equities were with the purchasers, as they agreed to pay the purchase price. The trial court also granted a rent credit to the purchasers in the amount of $1,000 per month from February 1, 2001 until the closing date, representing the difference between $3,000 per month in market rental value and $2,000 per month in actual rent.
A decree of specific performance is an equitable remedy "not granted as a matter of right or grace but as a matter of sound judicial discretion" governed by legal and equitable principles. Humphrys v. Jarrell, 104 So.2d 404, 410 (Fla. 2d DCA 1958). Specific performance shall only be granted when 1) the plaintiff is clearly entitled to it, 2) there is no adequate remedy at law, and 3) the judge believes that justice requires it. Mrahunec v. Fausti, 385 Pa. 64, 121 A.2d 878, 880 (1956).
In reviewing a grant of specific performance, we recognize that the granting of specific performance "rests largely in the discretion of the [judge] but the right to exercise this judicial discretion does not extend to the power or authority to contravene the legal requirements which must exist to give a litigant grounds upon which he may invoke the remedy." Howard Cole & Co., Inc. v. Williams, 157 Fla. 851, 858, 27 So.2d 352, 356 (Fla.1946). The purchasers, in order to invoke the remedy of specific performance, must meet the legal requirements of showing "by clear, definite and certain proof" that the seller failed to exercise reasonable diligence in clearing the title defects. See Blackmon v. Hill, 427 So.2d 228, 230 (Fla. 3d DCA 1983).
Reasonable diligence only requires the seller to act in good faith and appropriately in view of the circumstances; it does not require the seller to make extraordinary efforts or expenditures. Blackmon, 427 So.2d at 230. Determining *149 what constitutes reasonable diligence is a mixed question of law and fact requiring a fact-specific inquiry into each particular case. Blackmon, 427 So.2d at 230.
The trial court and both parties relied on this court's decision in Blackmon. In Blackmon, the sellers and purchasers entered into a contract for the sale and purchase of land, in which the seller agreed:
[T]o use reasonable diligence to make the said title good, marketable and insurable and shall have [a] reasonable time so to do, but if after reasonable diligence on his part, said title shall not be made good, marketable and insurable..., the money this day paid and all moneys that may have been paid under this contract shall be returned to purchaser, and thereupon both purchaser and seller shall be released from all obligations hereunder to each other. Or, upon request of the purchaser, the seller shall deliver the title in its existing condition. [e.s.]
Blackmon, 427 So.2d at 230. Prior to closing on the contract, the mortgage company found three unsatisfied judgments against the property and refused to issue a title insurance policy on the property. The sellers satisfied the smallest judgment and then offered to convey the property to the purchasers in its existing condition.[1] The purchasers ultimately refused to accept the property with the unsatisfied judgments.
In Blackmon, as in this case, the uncontroverted facts showed that: 1) the title company was not willing to issue a title insurance policy so long as the judgments against the property remained unsatisfied; 2) a mortgage loan would not be approved on the property with uninsurable title; and 3) the expected sales proceeds were insufficient to satisfy the judgments. Based on these facts, this court reversed the trial court's grant of specific performance, concluding that the purchasers failed to meet their burden of proving by "clear, definite and certain proof" that the seller could have exercised "other reasonable and certain means" to clear the title because the seller could not have reasonably made the title satisfactory. Blackmon, 427 So.2d at 230.
Applying the same analysis, we find that the purchasers in the instant case have failed to meet their burden of proof. As in Blackmon, the sales contract in the instant case required the seller to make a "diligent effort" to clear the title defects. The sales contract stated that both parties would be relieved of the obligations of the contract if the seller could not cure the title defects after making a "diligent effort." Furthermore, the sales contract specifically excluded the remedy of specific performance so long as the seller made a "diligent effort."
Based on the evidence in the record, we cannot find that the purchasers met their burden of proving that the seller failed to make a diligent effort to cure the title defects as required by the sales contract, or that the seller failed to exercise good faith to close on the sales contract. See Blackmon, 427 So.2d at 230. On the contrary, the record reflects that the seller was diligent and did make a good faith attempt to get the fraudulently procured mortgages paid off so as to clear the title defects. Moreover, in an effort to follow through with the sales contract, the seller agreed to lease the condominium to the *150 purchasers while he attempted to clear the mortgages.
The purchasers contend that the seller waived his right to cure title defects by allowing them to lease the condominium beyond the 45-day deadline for curing title defects. We disagree. Nowhere in the lease agreement is there a waiver of the 45 days to cure title defects. In fact, prior to entering into the lease agreement, the purchasers knew that the three mortgages may have been fraudulently procured and that it could take significant time to cure the title defects. Nonetheless, they decided to continue with the lease agreement for months hoping that the title defects may be cured.
Finally, the purchasers have failed to show that a decree of specific performance would not require the seller to make extraordinary efforts or expenditures to close on the sales contract. See Blackmon, 427 So.2d at 230. According to the seller's expert witness, at the initial scheduled closing the seller would have had to pay $51,772.56 in order to close. The purchasers claim that, if the seller timely informed Equicredit of the forged signature, there would have been enough closing proceeds to satisfy the remaining mortgages. While this may or may not be the case, the purchasers have not proven by "clear, definite and certain proof" how quickly Equicredit would have extinguished the loan had the seller informed it of the forgery earlier. See Blackmon, 427 So.2d at 230. It is noteworthy that Equicredit extinguished its loan after investigations were conducted by the three banks during their consolidated foreclosure actions. Therefore, it is uncertain whether Equicredit would have decided to extinguish the loan prior to the investigations.
As specific performance is an equitable remedy, the purchasers should be prepared to show that it will not be unjust or oppressive on the seller to have the contract enforced. Fish v. Leser, 69 Ill. 394 (Ill.1873). Under the facts of this case, the purchasers have not and cannot satisfy this burden.
Accordingly, we reverse the trial court's grant of specific performance and rent credit to the purchasers.
Reversed and remanded.
NOTES
[1] The sellers in Blackmon also offered the purchasers the option of obtaining a declaratory judgment that would protect the sale proceeds and the property from levy by the judgment creditors, but this court held that declaratory judgment was not an available option. Blackmon, 427 So.2d at 230.